**Mark A. WOODWORTH, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 70685.**

Missouri Court of Appeals,
Western District.

Aug. 10, 2010.

Application for Transfer to Supreme Court Denied Sept. 28, 2010.

Application for Transfer Dismissed Oct. 1, 2013.

Robert B. Ramsey, Edwardsville, IL, for Appellant.

Chris Koster, Attorney General, Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division I: JAMES M. SMART, JR., Presiding Judge, and MARK D. PFEIFFER and CYNTHIA L. MARTIN, Judges.

MARK D. PFEIFFER, Judge.

Mark A. Woodworth ("Woodworth") appeals the judgment of the Circuit Court of Clinton County ("motion court") denying his Rule 29.15 post-conviction motion, after an evidentiary hearing, in which Woodworth claims that the motion court deprived Woodworth of due process of law and, additionally, Woodworth claims he received ineffective assistance of trial counsel. On appeal, Woodworth presents three points, in which he argues that: (1) the motion court improperly denied access to discovery regarding the grand jury and two allegedly tainted trial jurors; (2) his trial counsel was ineffective for failing to properly advise Woodworth regarding a waiver of jury sentencing; and (3) his trial counsel was ineffective for failing to impeach one of the State's witnesses. We affirm.

## Background Facts and Procedural History

The facts of the underlying case, which we view in the light most favorable to the verdict, *State v. Kreutzer*, 928 S.W.2d 854, 859 (Mo. banc 1996), are: On November 13, 1990, Lyndel and Catherine Robertson were shot by Woodworth at their house near Chillicothe. Catherine Robertson died of two gunshot wounds to her head and chest. Lyndel Robertson survived three shots in the head and one in the shoulder. The State's evidence against Woodworth consisted of: (1) Woodworth's fingerprint on a box of bullets in the Robertsons' equipment shed; (2) expert testimony that the bullets used to shoot the Robertsons were similar to those in the box of bullets in their shed; (3) expert testimony from which the jury could reasonably infer that the gun of Woodworth's father was used to shoot the Robertsons; and (4) Woodworth's making contradictory statements to the police about whether he was ever in the Robertsons' shed.

In Woodworth's first trial in 1995, Woodworth was found guilty by a jury of murder in the second degree, assault in the first degree, burglary in the first degree, and two counts of armed criminal action. The jury recommended sentencing, respectively, of ten, five, ten, three and three years of imprisonment. The trial court imposed the sentences recommended by the jury to be served consecutively. Woodworth appealed his convictions, and this court reversed his convictions and remanded for a new trial due to evidentiary error. *State v. Woodworth*, 941 S.W.2d 679 (Mo.App. W.D. 1997). In our opinion, we did note, however, that the trial court did not err in denying Woodworth's motion for discovery into alleged violation of section 540.045, which provides that any person who has served as a member or alternate on a grand jury shall not be eligible to serve again for ten years. *Id.* at 695.

Upon retrial and largely based upon the same conviction supporting evidence, Woodworth was again found guilty by a jury of all charges. The jury recommended a sentence of fifteen years on the charge of burglary in the first degree and life sentences on each of the four remaining counts. On January 19, 2000, the trial court imposed the sentences recommended by the jury to be served consecutively. Woodworth's direct appeal of the convictions upon retrial was denied by this court on August 14, 2001, by *per curiam* order and without a published opinion, *State v. Woodworth*, 55 S.W.3d 865 (Mo.App. W.D. 2001), though the parties were provided a memorandum explaining this court's ruling. Notably, in the memorandum explaining this court's ruling, we rejected Woodworth's claim that the trial court's imposition of the jury's recommended sen-

tences to be served consecutively was a violation of his constitutional rights pursuant to the tenets of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (holding that a sentencing authority cannot act "vindictively" by imposing a higher sentence on retrial as punishment for those who successfully exercise their right to appeal). In so rejecting Woodworth's claim, we cited to *Chaffin v. Stynchcombe*, 412 U.S. 17, 35, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) ("[T]he rendition of a higher sentence by a jury upon retrial does not violate [the precepts of *Pearce* ] so long as the jury is not informed of the prior sentence and the second sentence is not otherwise shown to be a product of vindictiveness"). We concluded that *Pearce* was not applicable in Woodworth's retrial and sentencing because Woodworth's sentences were set by a jury and the jury was unaware of the prior sentences.

Woodworth filed an amended Rule 29.15 motion on March 14, 2003,[1] and a hearing was held on the motion on November 19, 2008, before the motion court. The motion court entered judgment denying Woodworth's Rule 29.15 motion, with 28 pages of findings of fact and conclusions of law, on January 13, 2009. This appeal follows.

### Standard of Review

■ Pursuant to Rule 29.15(k), our review is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." *See*

*Stiers v. State*, 229 S.W.3d 257, 260 (Mo. App. W.D.2007). Error is clear only if we have a "definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). We do not review the motion court's denial of post-conviction relief *de novo* and, instead, the findings of the motion court are presumptively correct. *Wilson v. State*, 813 S.W.2d 833, 835 (Mo. banc 1991).

■ In examining the finding of the motion court, we note that it was Woodworth's burden at the hearing to establish by a preponderance of the evidence that his attorney's representation was ineffective. Rule 29.15(i). To meet this burden, Woodworth is required to demonstrate that his trial counsel's actions were " 'outside the wide range of professionally competent assistance.' " *Franklin v. State*, 24 S.W.3d 686, 690–91 (Mo. banc 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Woodworth must further show that any errors by his trial counsel were so fundamental that his " 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Id.* at 691 (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's

---

1. "The maximum time limit for filing amended motions is not more than sixty days after counsel is appointed or entry of appearance by counsel that is not appointed. The time limits of Rule 29.15 are *valid and mandatory*. The remedy under Rule 29.15 exists *only* within the time limit specified." *Kilgore v. State*, 791 S.W.2d 393, 395 (Mo. banc 1990) (overruled on other grounds by *Glover v. State*, 225 S.W.3d 425 (Mo. banc 2007)) (internal citations omitted) (emphasis added).

*See also State v. Parker*, 274 S.W.3d 551, 554–55 (Mo.App. W.D.2008) ("Successive [post-conviction] motions are barred even when the movant alleges that the grounds for his motion were unknown at the time of his original motion."); *Schleeper v. State*, 982 S.W.2d 252, 254 (Mo. banc 1998) (Successive or untimely motions are not allowed under Rule 29.15.); *Strickland v. State*, 241 S.W.3d 456, 458 (Mo. App. W.D.2007).

defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Finally, even if Woodworth were to demonstrate that his trial counsel was constitutionally ineffective, he also has to demonstrate that specific failures of his trial counsel resulted in constitutionally unfair prejudice. *Id.* Woodworth's burden was to establish *both* his attorney's deficient performance and prejudice. *Clayton v. State,* 63 S.W.3d 201, 206 (Mo. banc 2001).

■ To satisfy the performance prong of the *Strickland* test, Woodworth "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *State v. Simmons,* 955 S.W.2d 729, 746 (Mo. banc 1997). Woodworth faces a heavy burden in establishing a claim for ineffective assistance of counsel and must overcome the presumption that his attorney is competent. *State v. Nunley,* 980 S.W.2d 290, 292 (Mo. banc 1998), cert. denied, 526

U.S. 1100, 119 S.Ct. 1580, 143 L.Ed.2d 674 (1999).

■ To satisfy the prejudice prong of the *Strickland* test, Woodworth "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Simmons,* 955 S.W.2d at 746. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Woodworth is required to show that, absent the complained-of error, there is a reasonable probability that he would have been found not guilty; merely showing that the alleged error had a conceivable effect on the outcome of the trial is not sufficient. *Johnson v. State,* 189 S.W.3d 640, 645 (Mo.App. W.D.2006).

### Analysis

#### Alleged Grand Jury Improprieties and Juror Misconduct

In his first point on appeal, like each of his points, Woodworth fails to follow the requirements of Rule 84.04(d).[2] Though Woodworth's failure to adhere to the rules of appellate procedure with regard to his points relied on constitutes a basis for this court to refuse to consider his appeal, *Crawford County v. Dep't of Natural Res.,* 51 S.W.3d 904, 908 (Mo.App. W.D.2001),[3]

---

**2.** Rule 84.04(d) states, in pertinent part: "The point shall be in substantially the following form: 'The trial court erred in [identify the challenged ruling or action], because [state the legal reasons for the claim of reversible error], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error].' "

**3.** In *Crawford County v. Department of Natural Resources,* this court noted that:

While the appellant in its point relied on does identify the ruling it is challenging and in general terms the legal reasons for the claim of reversible error, it fails to suffi-

ciently "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error," as required by Rule 84.04(d)(1)(C). Thus, it is nothing more than an abstract statement of law, which fails to satisfy the requirements of the rule as to a proper point relied on. Rule 84.04(d)(4). A point relied on which does not state why the legal reasons support the claim of reversible error, but instead sets out an abstract statement of law, is deficient and preserves nothing for appeal.

*Crawford County,* 51 S.W.3d at 908.

we choose to exercise our discretion to attempt to discern Woodworth's claims of error and respond to those claimed errors.

 In the Argument section of Woodworth's briefing on his first point, he refers to his request to obtain production of grand jury documents and transcripts, his request to depose witnesses relating to the grand jury, and his request to be permitted to interview or depose trial jurors from the retrial of his case, all of which constitutes requests for discovery and none of which is properly before this court in a Rule 29.15 motion. Woodworth either raised or should have raised these claims in his direct appeal(s).[4] A "post-conviction motion cannot be used as a substitute for a direct or second appeal." *Henderson v. State*, 786 S.W.2d 194, 196 (Mo.App. E.D.1990). "Constitutional claims which could have been raised on direct appeal are subject to waiver except 'where fundamental fairness requires otherwise and only in rare and exceptional circumstances.'" *Id.* at 197 (quoting *McCrary v. State*, 529 S.W.2d 467, 472 (Mo.App.1975)). Trial court error "[i]s outside the scope of a Rule 29.15 motion." *State v. Carter*, 955 S.W.2d 548, 555 (Mo. banc 1997). "Generally, trial court error is not cognizable in a [Rule] 29.15 motion unless fundamental fairness requires it to be raised, which only occurs in exceptional circumstances." *State v. Franklin*, 854 S.W.2d 438, 444 (Mo.App. W.D.1993).

There are no rare and exceptional circumstances here and none, quite frankly, alleged by Woodworth. Regarding Woodworth's allegations of due process error relating to the grand jury, Woodworth knew of this claim of error before his *first* direct appeal and actually raised the claim of error on his first direct appeal, which was rejected by this court. *Woodworth*, 941 S.W.2d at 695. Woodworth did not raise the allegation of grand jury impropriety in his direct appeal after retrial, though he could have. Regarding Woodworth's contention that two of the trial jurors in his retrial were coerced, Woodworth had knowledge of this alleged coercion between the time his retrial concluded and before he was sentenced. Yet, Woodworth did not seek a motion for new trial on this basis and did not raise the issue of trial juror impropriety on his direct appeal after retrial, though he could have. Woodworth is precluded from belatedly raising these issues of claimed trial court errors in

4. Woodworth's appellate counsel alleged at oral argument that there was "new evidence" of improprieties relating to the special prosecutor's failure to produce *any* transcripts of the grand jury proceeding that he had in his possession and the trial court's alleged bias in *removing* the Livingston County Prosecutor and replacing him with a special prosecutor from the Attorney General's office. First and foremost, "a Rule 27.26 [predecessor rule to Rule 29.15] motion is not the proper proceeding in which to present newly discovered evidence." *Reagan v. State*, 751 S.W.2d 793, 795 (Mo.App.1988). Instead, Rule 91 governs petitions for habeas corpus relief, a remedy that Woodworth is simultaneously pursuing as of the date of oral argument. Rule 91. Second, allegations of prosecutorial misconduct are not ordinarily cognizable in a Rule 29.15 proceeding because it constitutes trial error that should be raised on direct appeal. *Reagan*, 751 S.W.2d at 795. Third, filings with this court reflect that: (1) on November 29, 2003, the special prosecutor sent a letter to Woodworth's then attorney in which the letter states, in pertinent part: "I have enclosed a copy of the transcript of the grand jury proceedings conducted on October 19, 1993."; (2) On October 5, 1993, there is a letter from Douglas Roberts, then Livingston County Prosecuting Attorney, which states, in pertinent part: "I disqualify myself in this matter and request you [Judge Lewis] appoint the office of the Attorney General to represent the State of Missouri." Accordingly, Woodworth's summary of the "new evidence" is both inaccurate and misplaced, in light of the procedural unavailability of this argument in the context of the present appeal—an appeal of a Rule 29.15 motion.

his post-conviction motion.[5] Point I is denied.[6]

### Waiver of Jury Sentencing and Avoidance of Vindictive Sentencing

■ In Woodworth's second point on appeal, Woodworth first argues that the trial court on retrial "vindictively" sentenced him to four terms of life and fifteen years to be served consecutively. As we have stated previously herein, allegation of trial error is outside the scope of a Rule 29.15 motion. This issue must be raised in Woodworth's direct appeal after retrial, and as it turns out, the issue *was* raised on direct appeal and decided by this court. Certainly, this issue may not be raised both on direct appeal and again in a Rule 29.15 motion. *Williams v. State*, 205 S.W.3d 300, 307 (Mo.App. W.D.2006). Thus, as to Woodworth's argument that the trial court committed sentencing error,

we reiterate the commentary of this court from the memorandum explaining our ruling in Woodworth's direct appeal after retrial:

Woodworth argues that *Pearce* should be applied in his case, even though the jury recommended the sentence he received. We disagree. The United States Supreme Court emphasized in *Chaffin v. Stynchcombe*, 412 U.S. 17, 35, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), that "[t]he rendition of a higher sentence by a jury upon retrial does not violate" the precepts of *Pearce* "so long as the jury is not informed of the prior sentence and the second sentence is not otherwise shown to be a product of vindictiveness." Thus, *Pearce* is not applicable in this case because Woodworth's sentences were set by a jury and the jury was unaware of the prior sentences. Woodworth's contention is without mer-

---

**5.** Not so coincidentally, the cases relied upon by Woodworth in his briefing on these issues were appellate opinions issued after direct appeal, not post-conviction motions on appeal. And, the cases cited by Woodworth simply are not helpful to his arguments. For example, in *State v. Ringo*, 30 S.W.3d 811, 819–21 (Mo. banc 2000), the Supreme Court stated that: (a) personally identifiable information about grand jurors, such as names and addresses or grand jury master lists, is excessively burdensome and is not discoverable; and, (b) neither statute nor the state constitution mandate that grand jury proceedings be transcribed, and circuit courts have the discretion not to transcribe grand jury proceedings. Yet, Woodworth's discovery requests sought such grand jury information and alleged wrongdoing for the unavailability of a transcript of the grand jury proceedings. Further, *State v. White*, 138 S.W.3d 783 (Mo. App. W.D.2004), dealt with third party contact with jurors, not "juror coercion," and is inapposite to this case. We also note that even if we assumed that this was a proper forum for this claim, deliberations between *jurors* cannot be scrutinized because the sanctity of jury deliberations should not be invad-

ed. *State v. Babb*, 680 S.W.2d 150, 152 (Mo. banc 1984) ("The rule is perfectly settled, that jurors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict.").

**6.** We reiterate that the focus of Woodworth's appellate counsel's oral argument was that there was newly discovered evidence that was not available at the time of the filing of Woodworth's Rule 29.15 motion, nor at the time the Rule 29.15 motion was argued to the motion court. As we have discussed previously herein, a Rule 29.15 motion is not the proper proceeding in which to present newly discovered evidence, and it certainly is not appropriate to convict the motion court of error for failing to consider evidence or arguments that were not before the motion court at the time of the motion court's ruling. Woodworth's remedy is found in Rule 91, and Woodworth is pursuing the remedy outlined in Rule 91 with a petition for writ of habeas corpus that was pending before the Missouri Supreme Court at the time of oral argument.

it.[7]

(Numerous internal citations omitted.)

■ After renewing his direct appeal argument that the trial court erred in sentencing him, Woodworth attempts to relitigate this issue with the motion court by claiming that his trial counsel was ineffective for failing to advise him to waive jury sentencing. In large part, Woodworth's current argument is attempting to re-cast, in the guise of an ineffective assistance of counsel claim, the same issue he raised in his direct appeal and, as we have said before, "the appellant is not entitled to two bites at the same apple under the guise of post-conviction review." *Williams*, 205 S.W.3d at 307. Separate from re-arguing the vindictiveness claim, Woodworth's appellate counsel[8] also attempts to suggest that Woodworth's trial counsel should have advised him to waive jury sentencing, because in so doing, the trial court would have been limited to sentencing Woodworth to no more than the sentences imposed in the first trial. Whether or not Woodworth's counsel is right or wrong in the sentencing analysis, there is no evidence that had Woodworth's trial counsel explained such a jury sentencing waiver scenario to him, he would have agreed to waive jury sentencing. That is because all of the evidence before the motion court was that Woodworth was not seeking to limit his sentence—he was attempting to obtain an acquittal. As the motion court found in its judgment, at the time of retrial there was no bifurcated trial procedure available to him, and hence, his best chance for acquittal was to retry his case to a jury. Specifically, the motion court concluded:

> The decision in this case was a matter of sound trial strategy and counsel was not ineffective in failing to instruct Movant to waive his right to jury sentencing. It is general consensus among practicing attorneys in this area, that it is easier for the juries to decide a defendant guilty if they are not charged with the assessment of punishment. It should be noted that the second jury trial that took place was prior to our current bifurcated tr[ia]l procedure. Thus, it could definitely be argued that the best trial strategy would be for jury sentencing, especially if defense counsel is seeking an outright acquittal. If, on the other hand, defense counsel was seeking to minimize the severity of the assessment of punishment, the results of the first trial would have been accepted. So clearly, the trial strategy was to obtain an outright finding that Movant was not guilty of the crimes charged. In addition, no evidence was presented that Movant would have followed any advice to waive jury sentencing. This claim is therefore denied.

We agree. In the first trial, Woodworth was convicted of murder, assault, burglary, and two counts of armed criminal action, and the total of his consecutive sentencing was thirty-one years. For crimes as severe as these, if Woodworth's desire was to minimize the severity of punishment, his best strategy was to accept the convictions

---

7. *See also Johnson v. State,* 607 S.W.2d 808, 809 (Mo.App. S.D.1980) ("It was the jury that gave a greater punishment on each count at the second trial. The trial judge did not do so. *While the judge could have ordered the sentences to run concurrently, it does not follow that by not doing so he, and not the jury, was assessing a harsher sentence. His determination to have consecutive sentences was the same as that made ... following the first trial;* it was the jury's decision that caused appellant to receive greater sentences upon retrial.") (emphasis added).

8. Woodworth was represented at both his trial and retrial by different trial counsel than his current appellate counsel.

and sentencing from the first trial. Instead, Woodworth wanted the opportunity to seek acquittal, and he and his attorneys more than likely believed that the best opportunity for acquittal was if the burden of assessing punishment was before a jury (i.e. on the Verdict Form), not a judge.

Irrespective of any speculation one way or the other, Woodworth never testified that, had he been advised by counsel to waive jury sentencing, he would have agreed to do so. Without such evidence, Woodworth simply cannot meet his burden of showing any prejudice, even if we were to assume *arguendo* there were grounds for claiming that his trial counsel was constitutionally ineffective, a proposition that we do not agree with in the first place.

Point II is denied.

### Witness Impeachment

■ In Woodworth's third point on appeal, he argues that the motion court erred in finding and concluding that his trial counsel was not constitutionally ineffective, because trial counsel failed to utilize impeaching evidence against a witness who had the motive and opportunity to commit the crimes of which Woodworth was convicted.

It is, of course, well-settled that trial strategy decisions are virtually unchallengeable and rarely furnish a ground for finding ineffective assistance of counsel. *Storey v. State,* 175 S.W.3d 116, 125 (Mo. banc 2005); *Middleton v. State,* 103 S.W.3d 726, 736–37 (Mo. banc 2003). This premise includes trial counsel's strategic decisions concerning the selection of the witnesses and evidence that will be presented on a defendant's behalf. *Williams*

*v. State,* 168 S.W.3d 433, 443 (Mo. banc 2005).

Woodworth's lead trial counsel upon retrial was Bill Kutmus ("Kutmus"). Second chairing the retrial for the defense was Jacqueline Cook (now Judge Cook) ("Cook"). Kutmus testified to the motion court that he was familiar with Missouri's Rules of Evidence on impeachment of witnesses, that he elicited all of the testimony from each witness that he believed could help Woodworth's defense, that he consciously chose not to call a witness by the name of Carter for strategic reasons, and he denied that any decision at trial that he made was without sound trial strategy.[9] Cook disagreed and testified that Kutmus failed to properly use deposition testimony to impeach a witness by the name of Brandon Hagan, a/k/a Brandon Thomure. Cook also testified that a witness by the name of Carter would have testified, in her hearsay opinion, that "Mr. Thomure had *maybe* pulled out a knife [when Carter told Thomure he could not date his daughter]," though Cook also testified [regarding Carter's purported possible testimony], "I can't remember." Carter also had a criminal history and was a former client of Cook's, and Kutmus thought calling Carter might have neutralized some of what he felt was positive testimony for the defense through his witness examination of Brandon Hagan, a/k/a Brandon Thomure. Carter was not called as a witness in the hearing on the Rule 29.15 motion nor was any deposition testimony of Carter offered, such that the motion court had no evidence as to what Carter's testimony would have been, other than hearsay speculation by Cook.

---

9. The motion court was free to believe or disbelieve Kutmus's testimony. *Cent. Am. Health Scis. Univ., Belize Med. Coll. v. Norouzian,* 236 S.W.3d 69, 77 (Mo.App. W.D.2007). From the motion court's findings of fact, it is clear that the motion court found the testimony of Kutmus on this topic to be credible. And, as we explain *infra,* there was ample evidence from the retrial to support Kutmus's testimony on this topic.

At the retrial, Kutmus examined witness Brandon Hagan, a/k/a Brandon Thomure extensively. Prior to the attack on Lyndel and Catherine Robertson, Hagan dated the Robertsons' daughter, Rochelle, and their relationship was physically volatile. The Robertsons did not like Hagan, did not want him to date their daughter, and even considered seeking a restraining order against Hagan. Rochelle was pregnant with Hagan's baby at the time of the attack on Rochelle's parents. Though there were instances in which the trial court properly sustained objections for Kutmus's attempt at impeaching Hagan with his deposition transcript, Kutmus was still able to establish through the Hagan witness examination that: (1) Hagan had a volatile relationship with Rochelle Robertson; (2) Hagan had knowledge that Lyndel and Catherine Robertson strongly disapproved of Hagan's relationship with their daughter, Rochelle; (3) Hagan was familiar with the crime scene—the Robertson home; and (4) Hagan was aware that he was a suspect in the crime. In other words, Kutmus elicited testimony from Hagan enabling him to argue that Hagan had motive, opportunity, and the propensity to commit the crimes Woodworth was charged with. This was sound trial strategy to build reasonable doubt for the jury as to whether Woodworth committed the crimes or whether it was, in fact, Hagan.

Kutmus testified as to strategic reasons for not calling Carter as a witness. Kutmus testified that Carter's testimony would only have been cumulative to that which he had already obtained in his witness examination of Hagan, and he did not wish to risk the potential that the jury would frown upon the defense calling a witness who was represented by Woodworth's co-trial counsel and who had a criminal record. As stated previously, there is nothing but speculation as to what Carter would have testified to since he was not called as a witness in the hearing on the Rule 29.15 motion.

This simply is not one of those rare instances where the overwhelming evidence establishes that Kutmus's trial strategy decisions furnish a basis for concluding that Kutmus's representation of Woodworth at his retrial was constitutionally ineffective.

Point III is denied.[10]

10. Though not briefed, Woodworth's appellate counsel argued at oral argument that there was "new evidence" indicating that victim Lyndel Robertson had identified Brandon Hagan, a/k/a Thomure, as the attacker. This is not, however, "new evidence." At trial, a John Quinn testified that he had gone to visit Lyndel Robertson in the hospital and that Quinn asked Lyndel Robertson who shot him and Lyndel Robertson's reply was: "Brandon." There were other witnesses confirming the same sort of hospital conversations with Lyndel Robertson. In fact, a Neil Williams testified that Lyndel Robertson actually said he saw who shot him and it was "Brandon." But, Neil Williams's brother also testified that he was present for the conversation between Neil Williams and Lyndel Robertson and that he recalled that Lyndel Robertson merely stated who he thought it "could have been." There was also testimony from Lyndel Robertson explaining that he believed he was telling police investigators, friends, and family who he thought "could" have shot him or who he thought "might have wanted to shoot him." Lyndel Robertson and numerous other witnesses confirmed that Lyndel Robertson never said that he actually saw who shot him, and the evidence was that Lyndel Robertson hired private investigators with $35,000 of his own money to try to figure out who perpetrated the crimes (i.e. which raises the obvious question ... if Lyndel Robertson saw Brandon Hagan shoot and kill his wife and shoot and attempt to kill him, why would he spend $35,000 of his own money to try to find "the shooter"?). Irrespective, the notion that Lyndel Robertson accused someone other than Woodworth of committing the crimes is not "new evidence." That issue was exhaustively addressed by no less than seven witnesses at trial.

## Conclusion

Woodworth failed to meet his burden of proving ineffective assistance of trial counsel or other entitlement to relief under Rule 29.15. The motion court's judgment is affirmed.

JAMES M. SMART, JR., Presiding Judge, and CYNTHIA L. MARTIN, Judge, concur.